David CROSBY, Petitioner,

v.

Gary WATKINS, Warden, and The Attorney General of the State of Colorado, Respondents.

Civil Action No. 04–cv–01171–ZLW–MJW.

United States District Court, D. Colorado.

Jan. 28, 2009.

David Crosby, Canon City, CO, pro se.

John Jacob Fuerst, III, Colorado Attorney General's Office–Appellate Section, Denver, CO, Respondents.

ORDER OF DISMISSAL

ZITA L. WEINSHIENK, Senior District Judge.

The matter before the Court is Petitioner David Crosby's Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 (Application). Petitioner is serving a 30–year sentence after conviction in state court on charges of first degree sexual assault, false imprisonment, and prohibited use of a weapon. On June 9, 2004, Petitioner filed the present Application, setting forth three claims. Claim one states that "[t]he trial court erred in refusing to grant motion to suppress Petitioner's statements to police." Claim two states that "[t]he trial court erred in failing to grant motion to dismiss or alternatively for mistrial because of the destruction by police taped statements of the Petitioner and the victim." Claim three states that "[t]he appellate court erred in ruling that Petitioner had failed to properly raise the issue of deficient counsel for failing to obtain expert medical testimony." Petitioner filed his Application *pro se.*[1]

Pursuant to D.C.COLO.LCivR 72.1, this matter was referred to Magistrate Judge Michael J. Watanabe, who on June 4, 2007, issued a Recommendation On Application For a Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 By A Person In State Custody (Recommendation) in which he recommended that the Application be denied and that this action be dismissed with prejudice. Petitioner

1. Petitioner was represented by counsel in the state trial court proceedings.

thereafter filed Petitioner's Objection To Magistrate's Recommendation. The Court reviews *de novo* those portions of the Recommendation to which Petitioner has specifically objected.[2] Under the *de novo* standard, this Court makes "an independent determination of the issues" and does not "give any special weight to the [prior] determination."[3]

The factual background of this case and the proceedings in the state courts were recited in detail in the Magistrate Judge's Recommendation and will not be repeated herein.

### A. Legal Standard

Where a constitutional claim was adjudicated on the merits in state court, an application for a writ of habeas corpus by a person in state custody properly is granted only where the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[4] The state court's factual determinations must be presumed to be correct.[5]

### B. Analysis

#### 1. Motion to Suppress

Petitioner alleges in his first claim that the state trial court erred in denying his motion to suppress his statements to police. In his Application and supporting Memorandum In Support Of Petition For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 (Memorandum), Petitioner argued that the statements that he made to police before he was given a *Miranda* warning should have been suppressed because they were made while he was in custody, and that the statements that he made to police after he was given the *Miranda* warning and waived his *Miranda* rights were inadmissible because his *Miranda* waiver was involuntary as a result of his alcohol intoxication. In his objection to the Magistrate Judge's Recommendation, Petitioner asserts that the Magistrate Judge erred by failing to consider the following with respect to Petitioner's motion to suppress: (1) Petitioner's intoxication level at the time that he was given the *Miranda* warning, specifically, evidence that Petitioner was singing, speaking slowly, was unbalanced, and had bloodshot eyes, and the determination by Lt. John Dodson of the Avon, Colorado Police Department that Petitioner needed to be placed into protective custody due to his level of intoxication, and (2) the destruction by the Avon Police of audio tapes containing Petitioner's statements to the police, which he asserts "would have helped determine the truthfulness of the polices' version of events."[6]

A waiver of *Miranda* rights is valid only if it was knowingly, voluntarily, and intelligently made; it "must have been made with a full awareness, both of the nature of the right being abandoned and the consequences of the decision to aban-

2. *See* 28 U.S.C. § 636(b)(1); *see also United States v. One Parcel of Real Property,* 73 F.3d 1057, 1059 (10th Cir.1996) (court's *de novo* review is limited to "any portion of the magistrate judge's disposition to which specific written objection has been made....").

3. *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

4. 28 U.S.C. § 2254(d)(1), (2).

5. 28 U.S.C. § 2254(e)(1).

6. Petitioner's Objection To Magistrate's Recommendation (Doc. No. 28) at 1.

don it."[7] The Magistrate Judge determined that "[w]hile there was evidence that petitioner was intoxicated, the officers testified that petitioner was responsive, seemed to understand questions and responded to them intelligently (State Court Record Vol. 3 at 36 lines 1–5, 38 at lines 4–5), his speech was slow but clear, and he was 'quite coherent' (State Court Record Vol. 3 at 52, lines 9–10, 21)." Petitioner contends that other evidence of his intoxication, specifically, that he was singing,[8] was unbalanced, and had bloodshot eyes, and the fact that Officer Dodson felt the need to place him in protective custody due to his intoxication, indicates that he was so intoxicated that his *Miranda* waiver was involuntary. The Court disagrees. "The test of whether a person is too affected by alcohol or other drugs voluntarily and intelligently to waive his rights is one of coherence, of an understanding of what is happening."[9] The fact that Petitioner was singing, was unsteady on his feet, and had bloodshot eyes does not, alone, establish that he could not understand the nature of the rights that he was waiving and the consequences of that waiver, in the face of uncontradicted evidence that Petitioner was coherent, spoke clearly, understood questions, and responded intelligently. Specifically, Officer Dodson testified that Petitioner's speech was "slow but clear," that he was "quite coherent" and "was talking like a normal conversation," and indicated that Petitioner did not have slurred speech and did not have to have things repeated to him.[10] Officer Dodson testified that at no point did he feel that Petitioner did not understand the questions being asked of him,[11] and that he placed him in protective custody simply because he smelled of alcohol and Dodson believed that he was intoxicated.[12] There is no evidence in the record before the Court that Petitioner was intoxicated to such a degree that he could not comprehend what was being said to him, including the *Miranda* warning or the consequences of its waiver.[13] To the contrary, again, Officer Dodson testified that Petitioner was coherent and understood the questions he was asked.[14]

Petitioner argued in his Memorandum that the tape recording of his interview by Officer Dodson would have reflected his intoxication level.[15] This may or may not be true. However, there was alternate evidence submitted concerning Petitioner's intoxication level, namely, Officer Dodson's testimony indicating that although Petitioner had bloodshot eyes, was unsteady, sang, and smelled of alcohol, he was coherent, spoke clearly and without slurring, understood questions, and responded intelligently. The state court's factual determination as to Petitioner's alcohol level is presumed correct.[16] Having carefully reviewed the record, the Court concludes that the state courts' determination that Petitioner's waiver of his *Miranda* rights

7. *People v. May,* 859 P.2d 879, 882 (Colo. 1993).

8. Officer Perez testified at trial that Petitioner "kept talking and sometimes singing." (State Court Record Vol. at 40). Apparently, evidence that Petitioner was singing was not submitted on Petitioner's motion to suppress.

9. *U.S. v. Smith,* 608 F.2d 1011, 1012 (4th Cir.1979).

10. State Court Record Vol. 3 at 52–53.

11. *Id.* at 60.

12. *Id.* at 52.

13. *Id.*

14. *Id.* at 52–53, 60.

15. *See* Memorandum at 14.

16. *See* 28 U.S.C. § 2254(e)(1).

was knowing, intelligent, and voluntary was not contrary to, nor an unreasonable application of, clearly established federal law.[17]

### 2. Destruction of Tape–Recorded Statements

In his second claim, as further described in his Memorandum, Petitioner alleges that the destruction by the police of his taped statements and those of the victim to police violated his constitutional right to due process. Under *Arizona v. Youngblood,*[18] the failure to *preserve* potentially exculpatory evidence does not constitute a denial of due process unless the criminal defendant can show bad faith on the part of the police.[19] Petitioner has made no showing of bad faith on the part of the police in this case.[20] Thus, the failure to *preserve* the tapes does not constitute a due process violation.[21]

In his objection, Petitioner asserts that the Colorado Court of Appeals incorrectly characterized his due process claim stemming from the destruction of the tapes as a "general claim of potential exculpatory value," [22] which the court found be constitutionally insufficient under *Banks v. People* [23] and *State v. Morales.*[24] Petitioner argues that he is contending, more specifically, that the taped statements were not only exculpatory, but also impeached the victim, and that it was unreasonable for the state appellate court to "rule on the destruction of petitioner's statements but fail to rule on the destruction of the victim's statements." [25] However, the state Court of Appeals expressly noted Petitioner's argument that "the destroyed tape recordings had exculpatory value because the impeachment of a victim's account of a sexual assault and corroboration of a defendant's denial are always relevant in a sexual assault proceeding." [26] Ultimately, Petitioner's argument is the same with respect to both his own statements and the victim's statements: that they both had the potential to exculpate him (whether directly or by revealing untruthfulness on the part of the victim), and thus their destruction constitutes a due process violation. The Court concurs with the Colorado Court of Appeals that such a claim does not rise to the level of a due process violation.

Petitioner further objects to the Magistrate Judge's Recommendation on the ground that the Magistrate Judge "fail[ed] to acknowledge that police LIED to the court about the existence of the tapes." [27] However, Petitioner has cited to no portion of the record indicating that any police officer lied about the existence of the tapes, and the Court has found none. Rather, Officer Dodson testified that he did not mention the tapes, or the fact that they had been erased, at the suppression hearing because he "didn't feel it was rele-

**17.** *See* 28 U.S.C. § 2254(d)(1).

**18.** 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

**19.** *Id.* at 58, 109 S.Ct. 333; *see also Bullock v. Carver,* 297 F.3d 1036, 1056 (10th Cir.2002).

**20.** Officer Dodson testified that, pursuant to Avon Police Department policy, officers are allowed to reuse interview tapes unless they contain a confession. State Court Record Vol. 5 at 13.

**21.** *See Bullock,* 297 F.3d at 1056.

**22.** State Court Record Vol. 2 at 327.

**23.** 696 P.2d 293 (Colo.1985).

**24.** 844 S.W.2d 885 (Tex.App.1992).

**25.** Petitioner's Objection at 2.

**26.** State Court Record Vol. 2 at 327.

**27.** Petitioner's Objection at 3.

vant because that's our normal procedure and just to use the tapes only to refresh your memory while writing the report." [28] Officer's Dodson's omission, adequately explained, does not rise to the level of an attempt to deceive. Petitioner's objection lacks merit.

Lastly, Petitioner objects to the Recommendation because the Magistrate Judge stated therein that "the substance of the tape-recorded statements were [sic] disclosed to the petitioner by the prosecution," [29] when, Petitioner argues, the written report made from the tapes reflected only a small portion of the information contained on the tapes. Petitioner contends that there is no case law "even remotely close to the facts here where the police destroyed statements, lied about it to the court, then provided a tenth of what existed." [30] The question of whether any exculpatory evidence contained on the tapes was omitted from Officer Dodson's written report goes to the issue of whether there was a failure to *disclose,* as opposed to *preserve,* exculpatory evidence resulting in a violation of Petitioner's constitutional rights.[31] Under *Brady v. Maryland,*[32] the failure to *disclose* exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution." [33] In order to establish a *Brady* violation, Petitioner must show that: "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." [34]

Respondents argue that under *Morgan v. Gertz,*[35] where a taped interview is destroyed but a written summary of the interview is provided, only the duty to preserve evidence under *Arizona v. Youngblood* is implicated, not the duty to disclose. The Court finds such a reading of *Morgan* overbroad. In *Morgan,* the substantive evidence at issue was the victim's denial of sexual abuse by the defendant during a first taperecorded interview. Although the tape of that interview was later erased, the prosecution disclosed on several occasions during pretrial discovery the fact that the victim had denied any sexual abuse in the first interview. In the defendant's subsequent 42 U.S.C. § 1983 action, the United States Court of Appeals for the Tenth Circuit (Tenth Circuit) concluded that it was only the duty to preserve, not the duty to disclose, that was implicated in the state court proceedings because "[t]he state did not fail to disclose the fact that the girl did not inculpate Morgan in the first interview; the state provided Morgan with a written summary of the first interview." [36] The Tenth Circuit did *not* hold that the mere fact that the prosecution provided a written summary of the taped interview meant that the duty to disclose had been fulfilled; rather, the duty to disclose was fulfilled because the prosecution had disclosed the particular item of evidence at issue: the victim's initial statement that the defendant did not abuse her. Thus, this Court must look to whether the sub-

**28.** State Court Record Vol. 5 at 20.

**29.** Recommendation at 26.

**30.** Petitioner's Objection at 4.

**31.** *See Morgan v. Gertz,* 166 F.3d 1307, 1309 (10th Cir.1999).

**32.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**33.** *Id.* at 87, 83 S.Ct. 1194.

**34.** *Banks v. Reynolds,* 54 F.3d 1508, 1516 (10th Cir.1995).

**35.** 166 F.3d 1307 (10th Cir.1999).

**36.** *Id.* at 1309.

stance of any exculpatory evidence was disclosed, not the mere form of the disclosure, to determine whether the duty to disclose exculpatory evidence has been fulfilled.

The record contains no evidence of any material, exculpatory statements made by Petitioner while he was at the police station and being recorded that did not appear in Officer Dodson's written report, other than Petitioner's statement that he and the victim had engaged in consensual oral sex, and the trial court judge dismissed the charge based on oral sex for that very reason. Petitioner has contended that "at trial it became obvious that there were many statements allegedly made by the Petitioner that were not included in Dodson's report." [37] The only alleged inconsistencies that Petitioner describes, however, are that "Dodson testified but did not include in his report that the Petitioner stated that BOTH he and the victim were smoking cigarettes that night, a claim the Petitioner vehemently denied; he testified that only HE smoked that night," [38] and that "Dodson testified but did not include in his report that the Petitioner stated he went after the victim when she left his apartment because he was worried about her being dressed in his robe and carrying a gun." [39] Petitioner has not provided a record citation for this testimony, and the Court has not located such testimony in the record that has been filed in this Court. Nonetheless, Petitioner has failed to explain why such evidence would be exculpatory or material, and the Court finds that it is not. The Court agrees with the state trial court that the only potentially material, exculpatory evidence not included in the written report involved the charge concerning oral sex, which was dismissed. There was no unconstitutional failure to disclose under *Brady*.

### 3. Petitioner's Third Claim

The Magistrate Judge determined that Petitioner had failed to raise his third claim in state court in a procedurally proper manner, and had shown neither cause and prejudice for the default nor a resulting fundamental miscarriage of justice.[40] As a result, the Magistrate Judge properly concluded that the third claim was barred from review in this court for failure to exhaust state court remedies. Petitioner does not object to this aspect of the Magistrate Judge's Recommendation, and the Court agrees with and approves the Magistrate Judge's analysis and conclusion.

The Court has reviewed carefully, and approves and adopts, the remainder of the Magistrate Judge's Recommendation, to which no objections have been made.

For the foregoing reasons, it is

ORDERED that Petitioner's Objection To Magistrate's Recommendation (Doc. No. 28) is overruled. It is

FURTHER ORDERED that Petitioner David Crosby's Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 (Doc. No. 2) is denied, and this action is dismissed with prejudice.

## RECOMMENDATION ON APPLICATION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY

MICHAEL J. WATANABE, United States Magistrate Judge.

This case is before this court pursuant to a Special Order of Reference to United

37. Memorandum at 10.

38. *Id.* at 10–11.

39. *Id.* at 11.

40. *See Hickman v. Spears,* 160 F.3d 1269, 1271 (10th Cir.1998).

States Magistrate Judge issued by Senior Judge Zita L. Weinshienk. (Docket No. 6).

Before the court is the pro se incarcerated petitioner's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Docket No. 2), as amended (Docket Nos. 9 and 11), and petitioner's Memorandum of Law in Support (Docket No. 3). The respondents timely filed an Answer (Docket No. 12), and the petitioner filed a Traverse. (Docket No. 13). Upon order of this court (Docket No. 25), the Clerk of the District Court of Eagle County, Colorado, provided to this court the original written record (Docket No. 26) of Eagle County Case No. 93CR119, *People v. David Crosby,* which this court has reviewed. The court now being fully informed makes the following findings of fact, conclusions of law, and recommendation that the Application be denied and dismissed.

In his Application, the petitioner challenges a judgment of conviction entered in the District Court of Eagle County upon a jury verdict finding him guilty of two counts of first degree sexual assault, one misdemeanor count of prohibited use of a weapon, and one misdemeanor count of false imprisonment. Petitioner was sentenced to concurrent 32-year prison terms on each sexual assault count and to one-year terms on the weapon and false imprisonment counts that were to be concurrent with each other but consecutive to the 32-year sentence. The Colorado Court of Appeals ("CCA") affirmed the judgment of conviction but vacated his sentence and remanded for resentencing. *People v. Crosby,* Colo.App. No. 94CA1939 (Sept. 5, 1996). The Colorado Supreme Court denied certiorari on May 19, 1997. (See Pet. Attach. 2).

On September 18, 1997, the petitioner filed a motion for sentence reconsideration, and on January 28, 1998, the trial court reduced the petitioner's sexual assault sentences to 30 years and changed the misdemeanor sentences to run concurrently with the sexual assault sentences. (Resp. App. A).

Through counsel, on May 15, 1998, petitioner filed a motion in state court for post-conviction relief. (Resp. App. I). That motion was amended in January 1999 and went to hearing on July 19, 1999. (Resp. App. I). Following the hearing, in a written order, the trial court denied the petitioner's motion. (Pet. Attach. 3). Petitioner moved to reconsider, asserting that the court did not address certain issues, and the court issued another order rejecting those claims. (Resp. App. B). The CCA affirmed the trial court's order on December 4, 2003, 2003 WL 22864863 (Pet. Attach. 4), and the Colorado Supreme Court denied certiorari on May 3, 2004 (Pet. Attach. 5).

Petitioner raises the following three claims for habeas corpus relief: (1) the trial court erred in refusing to grant petitioner's motion to suppress his statement to the police; (2) the trial court erred in failing to grant his motion to dismiss or for a mistrial because of the destruction by police of the taped statements of the petitioner and the victim; and (3) the appellate court erred in ruling that petitioner had failed to properly raise the issue of deficient counsel for failing to obtain expert medical testimony.

Respondents assert (1) that the petitioner failed to exhaust claim three, which is procedurally defaulted; (2) the trial court properly denied the petitioners' motion to suppress his confession; and (3) the erasure of the audio tape recording of police interviews with the petitioner and the victim did not violate the petitioner's right to due process.

The CCA summarized this case as follows:

> On the night of the incident at issue, the victim went to an apartment in Avon, Colorado, which she had previously shared with the defendant. There, according to the victim, defendant threatened her with a handgun and forced her to submit to anal and vaginal intercourse. During the assault, the handgun discharged, the bullet striking a wall.
>
> After the assault, the victim diverted defendant's attention, fled from the apartment, and sought help from a man in a common area of the building. The man called the police. The subsequent events were found by the trial court to be as follows:
>
> Two uniformed officers arrived at 10:52 p.m. and found defendant in the common area of the building. Although it was a cold November evening, defendant was barefoot and was wearing only a pair of pants. He displayed indicia of alcohol intoxication.
>
> After telling one of the officers his version of events, defendant asked the officer to help him reenter his apartment in order to obtain clothing, but, because he did not have his keys, he was unable to gain entry. Defendant then agreed to accompany the officer to the police station, where defendant would be provided with warmth and shelter.
>
> The two men arrived at the police station at 11:00 p.m. and went to a patrol room. The door to the room was left open. It was very cold outside and defendant was still without shoes or a shirt. Defendant then made more statements to the officer about the victim. The officer did not then know the specific allegations which the victim had made to the other police officer.
>
> Defendant and the officer continued to talk. Defendant was cooperative and was "trying to get his story out." The officer asked defendant for permission to search the apartment, but defendant did not consent and said he thought he ought to consult an attorney. The officer then departed from the police station at 12:30 a.m., leaving defendant with the principal investigating officer (who was present in the patrol room during part of the time defendant was there but stayed "largely in the background" until the other officer left).
>
> Although the investigating officer believed that defendant was coherent, he thought defendant was too intoxicated to be allowed to leave the station. Also, the investigating officer, having heard the victim's allegations, believed he had probable cause to arrest defendant.
>
> At 12:37 a.m., the investigating officer informed defendant that he was a suspect in a sexual assault investigation and provided him with a *Miranda* advisement. Defendant then agreed to speak with the investigating officer without an attorney. At the conclusion of the interview, defendant was arrested.

*People v. Crosby,* 94CA1939 (Colo.App. Sept. 5, 1996); State Court Record Vol. 2 at 334–36.

***PROCEDURAL DEFAULT***

Respondents assert that the petitioner has failed to exhaust his third claim and that such claim is procedurally defaulted. Section 2254 of Title 28, U.S.C., as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides as follows with regard to exhaustion of state court remedies:

> . . .
>
> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State

court shall not be granted unless it appears that—

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented....

28 U.S.C. § 2254(b), (c). "Under the doctrine of exhaustion, a state prisoner must generally exhaust available state court remedies before filing a habeas corpus action in federal court.... The exhaustion doctrine requires a state prisoner to 'fairly present[ ]' his ... claims to the state courts before a federal court will examine them." *Demarest v. Price,* 130 F.3d 922, 932 (10th Cir.1997) (pre-AEDPA). *See Smallwood v. Gibson,* 191 F.3d 1257, 1267 (10th Cir.1999), *cert. denied,* 531 U.S. 833, 121 S.Ct. 88, 148 L.Ed.2d 49 (2000). Furthermore, "[o]n habeas review, [the] court will not consider issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Hickman v. Spears,* 160 F.3d 1269, 1271 (10th Cir.1998).

In this case, respondents correctly assert that the petitioner failed to raise his third claim in state court in a procedurally proper manner. As noted by the respondents, the CCA stated in its December 4, 2003, ruling:

> Defendant contends that his trial counsel rendered ineffective assistance by failing to introduce expert testimony on the victim's condition. He argues that the victim was not injured despite her testimony concerning the nature of the encounter. We disagree.
>
> Defendant did not raise this issue in his postconviction motion, and therefore, we need not consider it on appeal. *See People v. Lesney,* 855 P.2d 1364 (Colo. 1993); *People v. Goldman,* 923 P.2d 374 (Colo.App.1996). He first raised the issue in his supplemental appellate brief filed pro se, asserting that this issue was raised during the postconviction motion hearing, an assertion for which there is no support in the record.
>
> Defendant's postconviction counsel asked defendant's trial counsel several questions regarding introduction of expert testimony on the victim's condition, but failed to raise it as an issue for the Crim. P. 35(c) court to consider. Therefore, we will not consider it.

*People v. Crosby,* 01 CA0496 (Colo.App. Dec. 4, 2003); (State Court Record Vol. 2 at 621–22). As shown by the quote above, the CCA disposed of the petitioner's claim exclusively on the state ground that he had failed to raise the claim before the trial court in his postconviction motion. As demonstrated by the cases cited by the CCA in its opinion on this claim, this procedural bar has been regularly followed and applied evenhandedly to similar

claims. Therefore, plaintiff's third habeas claim was denied by the CCA on an adequate and independent state ground. *See Hickman,* 160 F.3d at 1271 ("A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision.... For the state ground to be adequate, it must be strictly or regularly followed and applied evenhandedly to all similar claims.") (quotations omitted). Petitioner has thus procedurally defaulted this claim, and he is procedurally barred from raising it in state court.

Inasmuch as the petitioner has not shown either (1) both cause for the default and prejudice therefrom or (2) a fundamental miscarriage of justice such as a colorable showing of factual innocence, *Coleman v. Thompson,* 501 U.S. 722, 749, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), this court is not required to review his third habeas claim on the merits.

***STANDARD OF REVIEW***

Contrary to the petitioner's assertions that the standards of the AEDPA do not apply here because his case precedes the AEDPA (see Docket No. 13 at 11, 14), the provisions apply to his habeas Application because it was filed after the AEDPA's effective date. *See Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Patton v. Mullin,* 425 F.3d 788, 793 (10th Cir.2005), *cert. denied,* 547 U.S. 1166, 126 S.Ct. 2327, 164 L.Ed.2d 846 (2006); *Brown v. Workman,* 49 Fed. Appx. 269 (10th Cir.2002).

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). "Under AEDPA, 'federal habeas review of state convictions is limited when the state courts have adjudicated a claim on the merits.'" *Parker v. Scott,* 394 F.3d 1302, 1308 (10th Cir.2005).

More specifically, 28 U.S.C. § 2254 now provides in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e)(1). With regard to § 2254(d)(1), the U.S. Supreme Court has stated that

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.... A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable

facts.... The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.... The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* [*v. Taylor,* 529 U.S. 362, 409–10, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000),] that an unreasonable application is different from an incorrect one.... See also *id.,* at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

*Bell v. Cone,* 535 U.S. at 694, 122 S.Ct. 1843.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases-indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). "Furthermore, under § 2254(d)(1), the only 'federal law' [the court] consider[s] is 'clearly established federal law as determined by decisions, not dicta, of the Supreme Court.' ... Thus, 'an absolute prerequisite for [a habeas petitioner's] claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent.'" *Parker v. Scott,* 394 F.3d at 1308.

With the above standards in mind, this court will review the petitioner's remaining two claims for habeas corpus relief.

***Motion to Suppress***

Petitioner asserts that the trial court erred in refusing to grant his motion to suppress his statement to the police because some of the statements were allegedly the result of custodial interrogation without the benefit of *Miranda* warnings and others were allegedly obtained after a purported involuntary waiver of *Miranda* rights. More specifically, in his Memorandum in Support of Petition, he asserts the following:

> Prior to trial the defense filed a motion to suppress statements made by Petitioner to police. At this hearing, officer Perez testified that he took the Petitioner back to the police station because he was dressed only in sweat pants and was unable to get back into his apartment. Perez testified that the Petitioner was not under arrest but was merely brought to the station for his convenience. While at the police station Perez asked the Petitioner about the victim and stated the Petitioner said that she had come over to his apartment to get her security deposit, that they drank some gin, had sex and then she had gotten mad an ran out of the apartment when he told her about another woman. Perez stated that although the Petitioner was free to leave, he never actually told him he could leave. The court denied the motion to suppress the statements made to Perez finding that "a reasonable person would not have anticipated arrest."; that the statements were the result of casual conversation and not interrogation. The court apparently puts no value on the fact that these "conversations" occurred in a police station after a woman had accused the Petitioner of sexually assualting [sic] her. It makes no difference that Perez had not talked to the victim before he interrogated the Petitioner since Perez was at the post office and observed and heard the victim accusing the Petitioner

of assaulting her. Perez knew at the minimum that the Petitioner was a suspect in a criminal act when Perez questioned him about his version of events. Therefore, the Petitioner's statements to Perez were the product of an un-Mirandized custodial interrogation and should have been suppressed.

Lt. Dodson was also at the post office and he spent the initial portion of the evening with the victim. As he entered the station Perez left and Dodson sat down with the Petitioner at the table. After observing the Petitioner's condition, he determined he would put the Petitioner in "protective custody." He then asked the Petitioner if he could enter his apartment to conduct a search. When Dodson asked him to sign a consent form the Petitioner stated he should talk to an attorney first. Dodson testified that he then advised the Petitioner of his Miranda rights. After the Petitioner signed a waiver of those rights, Dodson questioned him further. At trial Dodson testified regarding the request to search the apartment the Petitioner's refusal and invocation of his right to counsel and the statements he made about the events of that night. Even assuming that Perez was not engaging in the interrogation of the Petitioner at the police station and was only interested in polite conversation, the same could not be said of Dodson, who after talking with the victim before he interrogated the Petitioner, was specifically looking for probable cause to arrest the Petitioner. Dodson did NOT immediately give the Petitioner his Miranda advisement when he first began interrogate him, but instaed [sic] asked if the police could conduct a search. The Petitioner's refusal and request for counsel were the result of custodial interrogation and should have been suppressed. Additionally, since the Petitioner was so intoxicated that he needed protective custody, he was not capable of engaging in a voluntary of his Miranda rights. The officers' version of these events would seemingly be corroborated by the fact that they tape recorded the interrogation of the Petitioner, except that Dodson destroyed these statements by erasing the tapes! Then when asked by the court for any electronically recrded [sic] material at the discovery hearing, Dodson LIED about the existence of the tapes. He also LIED about the existence of the victim's taped statements, which he also destroyed. The Petitioner's level of intoxication may have been better determined if not for the destroyed tapes. What Perez failed to tell the court was that he asked the Petitioner questions about the ownership of the gun, why he and the victim were in stages of undress and why the victim was crying. All questions asked to elicit incriminating statements from Petitioner. We also will never know just how much the Petitioner was interrogated before Dodson Mirandized the Petitioner because of the destroyed tapes. Administration of Miranda before statements are made does not insulate them from inquiry whether the statements are voluntary.... At trial Perez testified that the Petitioner was singing incomprehensibly. No mention of this was made in the officer's notes and of course he never mentioned this at the suppression hearing. The reliability of a given witness may well be determinative or guilt or innocence, *non-disclosure of evidence falls within this rule* .... Because these officers destroyed this key evidence and then lied about it to the court, the facts the appellate court relied upon crumbles under the burden of deception.

(Docket No. 3 at vii 3).

Petitioner asserts that he was "in custody" for the purpose of custodial interrogation. He contends:

while it's possible the police initially took the Petitioner to the police station out of concern for his safety, that quickly dissapated [sic] as even Dodson admitted that prior to putting the Petitioner into "protective custody" he was evaluating the case for probable cause. It was clear that the officers would never have let the Petitioner leave as there was always an officer present with him in what was clearly a police dominated environment and the Petitioner was never told he could leave. With the focus of the custody analysis being on whether the person is deprived of freedom in any significant way, being placed in "protective custody," and told you will not be able to leave is certainly a deprivation of freedom constituting custody. Therefore these statements should have been suppressed at trial and the Petitioner's testimony at trial should be suppressed at any future proceeding, unless he decides to testify, as Petitioner felt forced to testify at trial to rebut the statement made by Dodson and Perez in violation of his Fifth Amendment rights.

(Docket No. 3 at 5).

Petitioner further asserts that the CCA's finding that his post-*Miranda* statements were admissible because he voluntarily waived his *Miranda* rights is not supported by the record. More specifically, he contends that

the evidence shows that at 2:30 a.m., hours after the Petitioner had waived his Miranda rights, he had a blood alcohol content of .193. It was projected by police at the time of his arrest his BAC was probably .243. Dodson testified that the Petitioner's eyes were bloodshot, he was unbalanced, and his speech, while clear, was slow. Also, let's remember Perez's testimony at trial where he stated that the Petitioner was singing incomprehensibly. Further, he was purportedly so intoxicated that Dodson discerned that it was necessary to put him into "protective custody" and not let him leave the police station because he was afraid that he "would not exercise good judgement." The appellate court's finding was that the Petitioner was so intoxicated that he could not be allowed to simply walk out of the police station but could exercise knowing and intelligent judgement in the serious decision to waive his Miranda rights; it's an oxymoron and they can't have it both ways. Further support for this comes from the Petitioner's request for an attorney. At this point ALL questioning should have stopped....

A review of the totality of the circumstances, especially in light of the fact that police destroyed material tape recordings of the event and then lied about it to the court, demonstrates that the Petitioner's waiver of his Miranda rights was not voluntary. Therefore, the court erred by not suppressing these statements. This was clearly a violation of the Petitioner's Fifth Amendment rights and his conviction should be overturned. The appellate court ruled that an in camera hearing discovered all of the statements contained in the officer's report (appellate court decision, attachment 1, p. 8). The court was in egregious error as verbatim transcriptions of the tapes would have produced anywhere from 15 to 30 pages of statements. Dodson disclosed 2 ½ (approx. 1 ½ pages from the Petitioner and 1 page from the victim's) tape recorded statements. The appellate court held that even if the inculpatory statements were obtained in violation of Miranda, it was harmless error due to the overwhelming evidence of the Petitioner's guilt.(appellate court decision, attachment 1, p. 6). It is clear from the posttrial questionaire [sic] returned by the jury that nothing

could be further from the facts in this case....

(Docket No. 3 at 68).

After a hearing, the trial court made the following findings with respect to the petitioner's motion to suppress:

Defendant's statements were made in five circumstances.

First, he gave information when officers responded to the Avon Post Office upon dispatch at about 10:52 p.m. He was not advised of his rights and officers noted evidence of intoxication. He was scantily clothed.

The initial contact and summary inquiry by Officer Gress were legitimate responses to the 911 call for help. Offer Perez continued that inquiry when he arrived by asking "What's going on." Defendant gave a pretty detailed response. No custodial interrogation occurred.

xxx

No statements of substance were apparently made during the period after Defendant left the post office with Mr. Perez at Defendant's request to get properly clothed. They tried to reenter the apartment. After that failed because Defendant had no keys, Perez asked if he'd voluntarily go to the police station and Defendant agreed. They drove to the station, Defendant in back behind a screen and with locked doors. Perez had not arrested Defendant but tagged along with him.

xxx

At the station, Defendant made some statements to Perez about Ms. Bacon. At this stage, from the point of view of Perez, Defendant was being provided warmth and shelter pending securing entry to his apartment. He was still shirtless and shoeless. This stage lasted from about 11:00 p.m. until Perez left at about 12:30. Officer Perez characterized this stage of the proceedings as involving chatter rather than investigation. Defendant was characterized as very cooperative. He was trying to get his story out. Officer Perez did not know what information Gress had obtained from Ms. Bacon, who he interviewed. The door to the patrol room was open and Perez felt defendant could have left though it was very cold outside. Perez did inquire of Defendant for voluntary consent to search the apartment. Defendant did not consent and said he thought he ought to see an attorney. At this stage, Perez left.

The preponderance of the evidence is that no custodial interrogation occurred until this point. Perez did not have the information other officers had obtained from Ms. Bacon. Defendant had been with Perez throughout and knew that he knew only what Defendant had said. A reasonable person in Defendant's position would not have anticipated arrest. Humanitarian concerns for Defendant's inability to enter his apartment and inadequate clothing motivated his hanging around the station.

xxx

The fourth stage of the investigation began about when Perez left and when Defendant expressed a desire to consult an attorney before consenting to search. Sergeant Dodson had been with Defendant and Perez at the police station for a good portion of the time they were there. He had assisted in efforts to secure Defendant's entry to his apartment but had stayed largely in the background until about the time Perez left.

Officer Dodson was the principal investigator of the case. He had responded to the post office. He heard some of the statements made by Ms. Bacon to Gress. He arrived at the police station

after Defendant and Perez. It was his view that Defendant would not be permitted to leave until the effects of intoxication wore off, although he was quite coherent. Dodson felt he had probable cause to arrest well before Perez left. At about the time Perez left, Defendant said he thought he ought to see and attorney before granting permission to search the apartment.

At about 12:37, Dodson told Defendant he was a suspect as to sexual assault. He advised Defendant of his rights to silence, to an attorney and to free legal assistance. Defendant then gave a detailed account and consent to search the apartment. Dodson inquired extensively. After Defendant was placed in a holding cell he gave consent to biological sampling and testing.

xxx

Perez returned and the fifth stage of the investigation commenced when he took Defendant to the hospital for tests. Defendant made some statements during this process. The People confess suppression as to these statements denying suicide ideation.

xxx

At the end of the third stage and at the onset of the fourth stage, after Defendant's remark that he wanted to see an attorney regarding the search and after Dodson became active but before the formal advisal, it is unclear what statements were made. If there were any they were made in a custodial situation and if elicited by questions of the officers should be suppressed.

Ordinarily, of course interrogation must cease when an attorney is requested. The evidence here is clear that defendant did not request an attorney generally. He was only concerned with legal advice as to the request for a search. Office [sic] Dodson properly responded to these issues and advised Defendant formally. Defendant knowingly and voluntarily waived his rights to counsel and to silence. No search was apparently made until after issuance of a warrant therefor.

The court therefore concludes that it would be improper to suppress statements made after the advisal even though advisal was preceded by a suggestion of a desire for counsel as to consent to search.

(Vol. 1, pp. 7880).

The CCA found the following with regard to petitioner's suppression arguments:

In support of his contention that all of his statements should have been suppressed, defendant first argues that the trial court erred by concluding that he was not in custody when he was at the police station with the first officer. Specifically, defendant maintains that the trial court applied an incorrect legal standard and failed to consider the first officer's knowledge that the victim had accused defendant of sexual assault and kidnapping. In addition, defendant contends that the trial court ignored the fact that, when speaking to that officer, he was so underdressed for the weather that he was effectively prevented from leaving the police station. We conclude that the trial court applied the appropriate standard and that the court's findings are sufficiently supported by the record.

The determination of whether a person is in custody so as to trigger the requirement for a *Miranda* advisement turns on an objective assessment of whether a reasonable person in the suspect's position would believe himself or herself to be deprived of freedom of action in any significant way. *People v. Viduya,* 703 P.2d 1281 (Colo.1985); *see*

*also People v. Wallace,* 724 P.2d 670 (Colo.1986). The existence of custody is "not limited to those situations involving a formal arrest." *People v. Horn,* 790 P.2d 816, 818 (Colo.1990).

Factors to consider in determining whether a person is in custody include: the time, place, and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions. *People v. Viduya, supra.* "[T]he fact that an interview takes place at a police station ... is not determinative of the custody issue." *People v. Horn, supra,* 790 P.2d at 818.

> The determination of whether an individual is "in custody" is a question of fact which must be resolved by the trial court. *People v. Johnson,* 671 P.2d 958 (Colo.1983). The court's findings of fact will not be reversed upon appeal when they are supported by competent evidence in the record. *People v. Trujillo,* 784 P.2d 788 (Colo.1990).

Here, the trial court found that defendant was not in custody until he stated that he wanted to see an attorney regarding the request to search his apartment. Accordingly, the trial court did not suppress any statements made by the defendant, except during the period between when he requested to speak with an attorney and his *Miranda* advisement.

The trial court found that defendant was not in custody then because the first officer did not know defendant was a suspect in the sexual assaults and defendant was at the police station only because he did not have access to his apartment and the officer had offered him shelter there.

Defendant contends that the trial court employed the wrong standard for determining whether defendant was in custody because the court focused on whether a reasonable person in defendant's position would have believed that arrest was imminent. We are not persuaded.

While the trial court did not explicitly set forth the appropriate "freedom of action" test set forth above, it is evident from the record that the court applied the appropriate legal standard. *See People v. Mack,* 895 P.2d 530 (Colo.1995) (although trial court phrased test for custody as whether defendant was "free to leave," the court's description of the controlling standard did not affect its assessment of the relevant evidence).

Significantly, defendant has not alleged that his initial decision to travel to the police station was in any way coerced by the police officers. And, clearly, a reasonable person electing to travel to the police station when partially clothed would be aware that, once there, it would be impractical to depart without clothing suitable for the cold weather. *Cf. People v. Vese,* 100 Misc.2d 8, 417 N.Y.S.2d 1015 (N.Y.Sup. Ct.1979) (under circumstances in which it was bitterly cold and defendant's apartment had just suffered a fire, questioning of defendant in police car was not custodial interrogation).

Defendant's final claim on this point is that the trial court erred by not suppressing his statement denying consent to search his apartment and requesting counsel to assist him in making a deci-

sion whether to consent to such a search. However, even if we were to assume that admission of his testimony was error, it was rendered harmless beyond a reasonable doubt by the overwhelming evidence of defendant's guilt. *See People v. Wilson,* 709 P.2d 29 (Colo. App.1985) (inculpatory statement obtained in violation of *Miranda* was harmless error due to abundant evidence of defendant's guilt).

. . .

Defendant next argues that the trial court erred in concluding that the prosecution had proven by a preponderance of the evidence that he voluntarily waived his *Miranda* rights. We conclude the trial court's findings are supported by the record.

Once advised of his or her privilege against self-incrimination and the right to counsel, a defendant may be subjected to custodial interrogation only if he or she thereafter voluntarily, knowingly, and intelligently waives those rights, and the prosecution has the burden of proving such waiver by a preponderance of the evidence. *People v. May,* 859 P.2d 879 (Colo.1993).

The validity of a waiver is determined in part by whether it was made with a full awareness, both of the nature of the right being abandoned and the consequences of the decision to abandon it. *People v. May, supra.*

Defendant maintains that he was so intoxicated at the time that he acknowledged and signed the *Miranda* advisement and waiver form that his waiver was not voluntary. We are not persuaded.

Although the trial court concluded defendant knowingly and voluntarily waived his rights, it did not make specific findings regarding defendant's level of intoxication. However, the evidence in the record supports the trial court's implicit determination that defendant was not so intoxicated that he was unable to comprehend the nature of his rights or the consequences of abandoning them. *See Smith v. State,* 639 So.2d 543 (Ala. Crim.App.1993) (extremely high blood-alcohol level insufficient to demonstrate that *Miranda* waiver was involuntary).

*People v. Crosby,* 94CA1939 (Colo.App. Sept. 5, 1996); State Court Record Vol. 2 at 33034.

"The Fifth Amendment to the United States Constitution guarantees that no person can be compelled to testify against him or herself in a criminal case.... A confession or admission made during custodial interrogation, but in the absence of legal counsel, can be admitted against a criminal defendant only if the defendant has waived his constitutional rights." *Abeyta v. Estep,* 2006 WL 1061955, *5 (D.Colo. Apr. 20, 2006) (citations omitted), *certificate of appealability denied,* 198 Fed.Appx. 724 (10th Cir.2006), *cert. denied,* 549 U.S. 1143, 127 S.Ct. 1006, 166 L.Ed.2d 758 (2007). "In order to be effective, a waiver must be made 'voluntarily, knowingly, and intelligently.'" *Smith v. Mullin,* 379 F.3d 919, 932 (10th Cir.2004) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "The Supreme Court has held that a court's inquiry into a waiver's validity 'has two distinct dimensions,'" namely:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requi-

site level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 932–33 (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

In this case, as noted above, the trial court found by a preponderance of the evidence that no custodial interrogation occurred until the petitioner responded to Officer Perez's inquiry regarding voluntary consent to search the apartment; petitioner did not consent and said he thought he ought to see an attorney. The trial court found that at that time, Officer Perez did not have the information other officers had obtained from the victim, that the petitioner had been with Officer Perez throughout, and that Officer Perez knew only what the petitioner had said. Moreover, the trial court found that a reasonable person in the petitioner's position would not have anticipated arrest and that humanitarian concerns for the petitioner's inability to enter his apartment and inadequate clothing motivated his hanging around the station. In addition, the trial court found that the petitioner knowingly and voluntarily waived his rights to counsel and to silence.

With respect to the petitioner's argument that the trial court erred by concluding that he was not in custody when he was at the police station with Officer Perez, the CCA found that the trial court applied the appropriate standard and that the court's findings are sufficiently supported by the record. The court stated, "Significantly, defendant has not alleged that his initial decision to travel to the police station was in any way coerced by the police officers. And, clearly, a reasonable person electing to travel to the police station when partially clothed would be aware that, once there, it would be impractical to depart without clothing suitable for the cold weather."

In addition, the CCA was not persuaded by the petitioner's argument that he was so intoxicated at the time that he acknowledged and signed the *Miranda* advisement and waiver form that his waiver was not voluntary. The court found that the evidence in the record supported the trial court's implicit determination that defendant was not so intoxicated that he was unable to comprehend the nature of his rights or the consequences of abandoning them.

Upon careful review of these rulings and the record, this court finds that the state court's decisions above did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The record supports the findings that the petitioner was partially clothed on a very cold evening, he agreed to accompany the police officer to the police station, the patrol room door was left open, and petitioner was cooperative during the initial conversation in an effort "to get his story out." While there was evidence that petitioner was intoxicated, the officers testified that the petitioner was responsive, seemed to understand questions and responded to them intelligently (State Court Record Vol. 3 at 36, lines 15, 38 at lines 45), his speech was slow but clear, and he "was quite coherent" (State Court Record Vol. 3 at 52, lines 910, 21). In sum, habeas relief is not warranted on this claim.

***Destruction of Tape Recorded Statements Made by the Petitioner and the Victim***

Petitioner next contends that the trial court erred when it refused to grant his

motion to dismiss or his motion for a mistrial which were based upon the destruction by the police of tape-recorded statements made by the petitioner and the victim. He asserts that the evidence was lost by state action, that it possessed an exculpatory value that was apparent before the evidence was lost or destroyed, that he was unable to obtain comparable evidence by reasonably-available means, and that it was a discovery violation. More specifically, petitioner asserts:

> After Dodson interviewed the Petitioner at the police station, he prepared a report purporting to be a comprehensive summary of every relevant statement made by the Petitioner during the interrogation. However, at trial it became obvious that there were many statements allegedly made by the Petitioner that were not included in Dodson's report. For example, Dodson testified but did not include in his report that the Petitioner told him that he and the victim had engaged in oral sex that evening. Dodson testified but did not include in his report that the Petitioner stated that BOTH he and the victim were smoking cigarettes that night, a claim the Petitioner vehemently denied; he testified that only HE smoked that night. It is noteworthy that no nicotine was present in the victims [sic] blood. (see attachment 7, p. 3). Dodson testified but did not include in his report that the Petitioner stated he went after the victim when she left his apartment because he was worried about her being dressed in his robe and carrying a gun. There were several other statements as well. At the in camera hearing, the district attorney confessed there was an order by the trial court for discovery of all oral statements made by the Petitioner. In addition to his "new" statements given on the stand, Dodson confessed few others. However, a verbatim transcript of both the Petitioner's and the victim's statements would have produced anywhere from 15 to 30 pages of statements.
>
> The defense argued that a mistrial was warranted because these were allegedly the statements of the Petitioner and hence very important to the defense, that they corroborated the victim's testimony, that the jury had already heard the statements so the damage was done, that had they been disclosed earlier the defense could have challenged the, and, finally, that the cross-examination of other witnesses and voir dire may have been different....
>
> ...
>
> Here Dodson testified that the tapes were collected in the performance of routine procedures. It is no surprise that he could give no good reason why they were not preserved; he stated he did not have to preserve tapes unless they were in the nature of a confession and that the tapes (two micro-cassettes) would be a "storage problem." Therefore it is clear that the state destroyed the evidence by intentional state action.
>
> ...
>
> Dodson, an experienced police officer as evidenced by his rank of Lieutenant, had to know that often times sexual assault cases hinge on credibility determinations and consequently he knew of the importance of impeachment material in these cases. Having interviewed both the Petitioner and the victim, he knew that the alleged sexual assault took place at the Petitioner's apartment with no witnesses. At the time he interrogated the Petitioner he was trying to figure out probable cause (and arrested him at that time), considered him a suspect in a sexual assault, and had already placed him in "protective custody."

Therefore, when Dodson made the tapes (when he taped the victim's statements he had **already arrested** the Petitioner), he knew there were criminal charges being brought against the Petitioner and also knew the importance of these statements for corroborative and impeachment value. That Dodson acted in bad faith is beyond refutation; what could possibly be a more powerful piece of evidence for the prosecution then [sic] to be able to play a recording to the jury of a victim's recital of how she was sexually assaulted? The only conclusion a reasonable person could reach is that there was material on those tapes that could hurt the prosecutions [sic] case or bolster the defense's case. There could be no other motive....

...

This case hinged on the credibility of the Petitioner and the victim as both testified and both gave dramatically different versions of the evening. By not having these tapes, the Petitioner was denied the opportunity to fully litigate the voluntariness of his statements in the suppression hearing, was denied the opportunity to have his testimony at trial supported by his statements on the night of the incident, was denied the opportunity to have his demeanor and intoxication level, as reflected by his own statements and voice, considered by the jury to explain some of his actions that night, was denied the opportunity to impeach the victim with her own words in her own voice, and was denied the opportunity to fully impeach Dodson at trial with the descrepancies [sic] between his typed report, his memory of what was said by the Petitioner and the victim, and his testimony at trial. *There was no other evidence that would have the same impact as the parties [sic] verbatim statement made in their own voices....*

The trial court's sanction for the destroyed statements was to dismiss the alleging [sic] oral sex. This sanction was impotent as a pretrial agreement resulted in any convictions for sexual assault being run concurrently. This was no sanction for the prosecution who entered into this agreement after knowingly sending the blood samples to be tested at a lab they knew had been decertified almost a year before. The intent was to get the decertified lab to use up the samples and thereby prevent them from being tested at a certified laboratory. It is no coincidence that the results opposed the victim's allegations regarding being forced to smoke cigarettes at gunpoint.... Affording the defense the "opportunity" to a broad cross-examination of Dodson, something already allowed in normal procedure, was a nothing sanction. Since the Petitioner was extremely intoxicated and the victim constantly made inconsistent statements, the only other testimony that was available as to what actually was said that night by the parties *came from the person responsible for the destruction of the tapes.* As demonstrated by Dodson's own testimony, and his lie to the court about the existence of the tapes, he was not a credible source of what was said and done that night.

(Docket No. 3 at 1016). Petitioner claims that the destruction of the tapes deprived him of due process of law under the Fourteenth Amendment and his Sixth Amendment right to confrontation.

The CCA found the following with respect to the destruction of these tapes:

Defendant also contends that the trial court abused its discretion in not granting his motion for a mistrial as a remedy for a discovery violation. We perceive no abuse of discretion.

Prior to trial, defendant filed a motion for discovery of all oral statements made either by him or any witness contacted during the investigation, whether tape-recorded or reduced to writing. The prosecution confessed the motion.

During the trial, it became apparent that defendant and the victim had made numerous statements to the investigating officer which he had not included in his reports summarizing the interviews. The officer failed to disclose that, after waiving his *Miranda* rights, defendant had told the officer: (1) that he and the victim had engaged in oral sex; (2) that he and the victim had both been smoking cigarettes; (3) that he had followed the victim into the common area of the building because she had taken the handgun and he was concerned about her; and (4) that he had asked the victim to come to his apartment in order to help him pack. After conducting an *in camera* cross-examination to discover all statements not contained in the officer's report, defendant moved for a mistrial.

The trial court denied defendant's motion for a mistrial, ruling that defendant could conduct broad cross-examination in order to demonstrate to the jury that the investigating officer had withheld certain statements. The court reasoned that the statements not included in the report related to matters which were not so prejudicial to defendant as to warrant a mistrial.

The imposition of sanctions for failure to comply with criminal discovery rules is within the sound discretion of the trial court. Crim. P. 16(III)(g); *People v. Thurman,* 787 P.2d 646 (Colo.1990). Absent a cogent demonstration of prejudice to a defendant, a conviction will not be reversed solely because of noncompliance with discovery rules. *Salazar v. People,* 870 P.2d 1215 (Colo.1994); *People v. Graham,* 678 P.2d 1043 (Colo.App. 1983), *cert. denied,* 467 U.S. 1216 [104 S.Ct. 2660, 81 L.Ed.2d 366] (1984).

A "mistrial is a drastic remedy and is warranted only when the prejudice to the defendant is too substantial to be remedied by other means.... Moreover, the trial court has broad discretion in determining whether mistrial is required, and its determination may be reversed only for gross abuse of discretion and prejudice to the defendant." *People v. Gillis,* 883 P.2d 554, 561 (Colo. App.1994) (citation omitted).

Inasmuch as the trial court allowed defendant wide-ranging cross-examination of the investigating officer to minimize any prejudice, we perceive no abuse of discretion in its refusal to order a mistrial.

...

In a related claim, defendant asserts that the trial court erred by not granting his motion seeking dismissal of all charges or a mistrial once the investigating officer revealed that he had failed to preserve tape-recorded interviews he had conducted with defendant and the victim. We disagree.

On re-direct examination, the officer revealed that his interviews with defendant and the victim had been tape-recorded. In an *in camera* hearing, the investigating officer explained that he had used the tape recordings to prepare his written reports and then erased the tapes in order to reuse them. The officer confirmed that he had never mentioned the existence of the tapes to anyone in the district attorney's office.

On the basis of the officer's testimony, defendant moved for dismissal of all charges or a mistrial as a remedy for the loss of evidence and asserted discovery violation. The trial court granted defendant's motion in part, dismissing

the sexual assault charge which alleged that defendant had forced the victim to engage in oral sex. The trial court reasoned that the only material evidence contained in the tape recording which was not available to defendant by means of the officer's report was the defendant's statement to the officer describing consensual oral sex with the victim. The trial court concluded that, with the dismissal of this charge, the prejudice to defendant was insufficient to warrant a mistrial. However, the court directed that defense counsel could interview the victim prior to resuming cross-examination of the investigating officer and, if defendant wished, could recall the victim to testify further.

The constitutional duty imposed upon the state to preserve evidence is limited to that evidence that is constitutionally material. For evidence to be constitutionally material, the evidence (1) must have an exculpatory value that was apparent before the evidence was lost or destroyed; and (2) the defendant must be unable to obtain comparable evidence through other available means. *People v. Wyman,* 788 P.2d 1278 (Colo.1990).

Here, defendant maintains that the destroyed tape recordings had exculpatory value because the impeachment of a victim's account of a sexual assault and corroboration of a defendant's denial are always relevant in a sexual assault prosecution. As the trial court correctly recognized, defendant's general claim of potential exculpatory value is constitutionally insufficient. *See Banks v. People,* 696 P.2d 293 (Colo.1985); *see also State v. Morales,* 844 S.W.2d 885 (Tex. App.1992) (because defendant's tape-recorded interview contained inadmissible, self-serving hearsay, it did not have exculpatory value such that police conduct of erasing and reusing the tape amounted to a due process violation).

Although the failure to preserve the tape-recorded interviews did not amount to a due process violation, the investigating officer's failure to disclose that the tape-recordings had been made and erased was clearly such a violation. However, because any prejudice to defendant was cured by the court's remedial orders, we reject defendant's claim that the court abused its discretion in not declaring a mistrial.

*People v. Crosby,* 94CA1939 (Colo.App. Sept. 5, 1996); State Court Record Vol. 2 at 326–30.

"The duties to disclose and preserve impeachment/exculpatory evidence are grounded in the due process right to a *fair trial.*" *Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir.1999) (citing *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). "Under *Youngblood* [*Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ], a defendant can establish a due process violation if he can show that (1) the government failed to preserve evidence that was 'potentially useful' to the defense; and (2) the government acted in bad faith in failing to preserve the evidence." *Riggs v. Williams,* 87 Fed.Appx. 103, 106 (10th Cir.2004) (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333), *cert. denied,* 541 U.S. 1090, 124 S.Ct. 2823, 159 L.Ed.2d 254 (2004). *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Snow v. Sirmons,* 474 F.3d 693, 716 (10th Cir.2007) ("Supreme Court authority makes clear that when dealing with lost or destroyed evidence, 'unless a criminal defendant can show bad faith on the part of the police,

failure to preserve *potentially useful* evidence does not constitute a denial of due process of law.' "). "[T]he inquiry into bad faith 'must necessarily turn on the police's knowledge of the exculpatory value of the evidence." *Riggs v. Williams,* 87 Fed. Appx. at 106 (citing *Youngblood,* 488 U.S. at 57 n. *, 109 S.Ct. 333). However, the "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." *Id.* (quoting *United States v. Bohl,* 25 F.3d 904, 910 (10th Cir.1994)). "This is true even if the government acted negligently ... or even intentionally, so long as it did not act in bad faith." *Id.* "The issue of bad faith under *Youngblood* is a mixed question of law and fact in which the quintessential factual question of intent predominates...." *Id.* Therefore, this court must determine whether the facts are correct and whether the law was properly applied to the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

Here, this court finds that the state court's conclusions regarding the tape recordings did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, and did not result in an unreasonable determination of the facts presented in the state court proceeding. The evidence supports the trial court's finding that neither the prosecutor nor the officer acted in bad faith with respect to the erasure of the tape recordings of the officer's interviews of the petitioner and the victim. The court stated:

> The Court simply would not find any fault on the part of the district attorney other than maybe administratively not becoming aware of the police procedures, and I thought that he was credible and good faith in being surprised that a tape had been made and destroyed. The officer appears to have been in good faith in strictly following the employee procedures, evidenced by exhibit A.[1] There's some question about because that of the exceptions in the—in paragraph 30, or .30, which says "confessions or other similar type information," but I'm not convinced by the variances between his testimony and what's in his reports that there's any real violation of destroyed—real violation by having destroyed, particularly exculpatory information....

(State court records, Vol. 5 at 32, line 15, to 33, line 2). This ruling is not an unreasonable application of clearly established federal law, which is set forth above.

Petitioner also asserts that there was a discovery violation. "*Brady* [*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] provides that the State's suppression of 'evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment.' ... This is so irrespective of the prosecution's good or bad faith." *Knighton v. Mullin,* 293 F.3d 1165, 1172 (10th Cir.2002), *cert. denied,* 538 U.S. 930, 123 S.Ct. 1588, 155 L.Ed.2d 325 (2003). "In the usual case, a [petitioner] seeking habeas relief for an alleged *Brady* violation 'must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense.' " *Trammell v. McKune,* 485 F.3d 546 (10th Cir.2007) (quoting *Snow v. Sirmons,* 474 F.3d 693, 711 (10th Cir.2007)).

The court agrees with the respondents, however, that the issue here is not wheth-

1. As noted by the CCA, in an *in camera* hearing, the investigating officer explained that he had used the tape recordings to prepare his written reports and then erased the tapes in order to reuse them.

er the prosecution failed to disclose exculpatory evidence. The officer used the tape recordings to prepare his written reports, which were disclosed to the petitioner. Therefore, the substance of the tape-recorded statements were disclosed to the petitioner by the prosecution. *See Morgan v. Gertz*, 166 F.3d 1307, 1309 (10th Cir.1999) (Duty to preserve under *Arizona v. Youngblood*, not duty to disclose under *Brady*, was implicated in the state court proceedings when the state provided the defendant with a written summary of a tape-recorded interview that had been taped over by the interviewer.).[2]

Based upon the discussion and findings above, this court finds that there is no basis upon which to grant the Application on the basis of this claim.

## CONCLUSION

In sum, based upon a thorough, independent review of the record and the relevant federal law, this court finds that the state court's conclusions did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in an unreasonable determination of the facts presented in the state court proceeding.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Docket No. 2), as amended (Docket Nos. 9 and 11), be **DENIED** and **DISMISSED WITH PREJUDICE.**

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Fed. R.Civ.P. 72(b), *Thomas v. Arn*, 474 U.S. 140, 148–53, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colorado Dep't of Corrections*, 183 F.3d 1205, 1210 (10th Cir.1999); *Talley v. Hesse*, 91 F.3d 1411, 1412–13 (10th Cir. 1996).

Dated: June 4, 2007

Denver, Colorado

---

**2.** In any event, as noted by the CCA, the trial court reasoned that the only material evidence contained in the tape recording which was not available to the petitioner by means of the officer's report was the petitioner's statement to the officer describing consensual oral sex with the victim. The trial court concluded that, with the dismissal of this charge, the prejudice to the petitioner was insufficient to warrant a mistrial. However, the court directed that defense counsel could interview the victim prior to resuming cross-examination of the investigating officer and, if petitioner wished, could recall the victim to testify further. The CCA found that "because any prejudice to defendant was cured by the court's remedial orders, we reject defendant's claim that the court abused its discretion in not declaring a mistrial."